Randy L. WATSON, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 48A05–0205–CR–229.

Court of Appeals of Indiana.

March 4, 2003.

 ☞1153(1)

David W. Stone, IV, Anderson, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Randy L. Watson (Watson), appeals his conviction of battery resulting in serious bodily injury to a person less than fourteen years of age, a Class B felony, Ind.Code § 35–42–2–1(a)(4).

We affirm.

### ISSUES

Watson raises two issues on appeal, which we restate as follows:

1. Whether the trial court properly admitted the results of a Minnesota Multi–Phasic Personality Inventory (MMPI)

completed by Watson in the course of a Children in Need of Services (CHINS) action over Watson's assertion of physician-patient privilege;

2. Whether the trial court properly sentenced Watson.

### FACTS AND PROCEDURAL HISTORY

C.T., a three-year old child, lived with his mother, Freda Tucker (Tucker) and her fiancé, Watson, in Anderson, Indiana. Watson worked during the day and Tucker worked from 6 p.m. to 2 a.m. daily. During the time that Tucker was at work, Watson took care of C.T.

During the months of June and July 1999, C.T. was admitted to the hospital on three different occasions. First, on June 9, 1999, C.T. had an acute concussion, a crush injury to his finger, and bruising around his left eye. Watson testified that C.T. was climbing on a chair and a stand by the bed and fell, which resulted in an acute concussion. Further, Tucker testified that she accidentally closed a car door on C.T.'s finger earlier in the week.

Next, on June 23, 1999, Watson and Tucker took C.T. to the Community Hospital emergency room with second-degree burns on his neck and body. Watson testified that while he was cooking spaghetti, he turned to drain the spaghetti, and water spilled on C.T., who was standing at his feet. During his emergency room visit, Jane Patz (Patz), the registered nurse at Community Hospital who examined C.T., also noticed a small amount of dry blood outside of C.T.'s left ear and a speck of fresh blood inside his ear. Additionally, Patz noticed that C.T.'s left eardrum had a hole in it.

Based upon the extent of C.T.'s burns and the delay in bringing him in for treatment, the hospital called the trauma team, which investigates suspected child abuse.

An investigator for the County Child Protective Services talked to Watson about the incident and performed a background investigation on C.T. and Tucker.

Lastly, on July 3, 1999, Watson and Tucker took C.T. to St. John's Hospital emergency room with a spiral fracture to his left femur. Watson testified that he and C.T. were taking a shower and C.T. wanted to get out of the shower, so he placed a towel around C.T. and sat him on the toilet. Watson further testified that C.T. then started to climb off of the toilet and fell between the toilet and the tub. The orthopedic surgeon who operated on C.T.'s leg fracture testified that the bone was in separate pieces that were five to seven millimeters apart. The surgeon also testified that in order to fracture a child's bone in that manner, a high amount of energy had to occur; specifically, the fall was equivalent to falling from a third floor of a building. Additionally, during surgery on his leg, the doctors found that C.T. suffered a fracture of the stapes bone in his left ear and also that spinal fluid was leaking from his left ear. Thus, his diagnosis was one of a battered child. As a result, the hospital notified the trauma team and Child Protective Services of the injuries that C.T. sustained.

On July 3, 1999, Anderson Police Patrolman Steve Demick (Patrolman Demick) transported Watson to the police station from the St. John's emergency room. Watson voluntarily agreed to go to the police station and was not handcuffed. While at the police station, Anderson Police Detective Kevin Smith (Detective Smith) questioned Watson in a videotaped interview. Watson was advised of his rights. In the interview, Watson was questioned about C.T.'s leg injury and other injuries sustained by C.T. Watson attributed C.T.'s leg injury to the use of a wrestling hold called the "camel clutch."

When the interview was over, Watson was transported by a police officer back to the hospital where he left his car.

On October 26, 1999, the State filed an information against Watson, charging him with Count I, battery resulting in serious bodily injury to a person less than fourteen years of age, a Class B felony, I.C. § 35–42–2–1(a)(4); and Count II, battery resulting in serious bodily injury to a person less than fourteen years of age, a Class B felony, I.C. § 35–42–2–1(a)(4). On April 27, 2001, the State filed an amended information, charging Watson with Count III, neglect of a dependent, a Class B felony, I.C. § 35–46–1–4.

On July 20, 2001 through July 26, 2001, a jury trial was held. During the trial, Watson submitted as evidence the testimony of Dr. Susan Spencer (Dr. Spencer) who viewed the videotape of Watson's interview with Detective Smith. Dr. Spencer administered an MMPI test on Watson and testified at trial as to the results of the MMPI. Dr. Spencer's diagnosis was that Watson was very mentally disturbed. Further, Dr. Spencer testified that Watson was under extreme duress at the time of the police interview and she believed that Watson would have said anything to conclude the interview.

Alternatively, the State submitted the testimony of Dr. David Tarr (Dr. Tarr) over Watson's objection. Outside the presence of the jury, Dr. Tarr testified that he examined Watson at the request of Child Protective Services. Dr. Tarr examined Watson on November 15, 2000, December 12, 2000, and March 26, 2001. The purpose of the consultation was to determine Watson's capacity as a parent of a dependent child. The court order provided that if Watson did not complete the evaluation process, he would not be allowed to visit C.T. Dr. Tarr administered an MMPI to Watson, which he interpreted

as showing that Watson was more likely to submit to authority. Additionally, Dr. Tarr stated that Watson's score on the "over control hostility" scale was close to the clinical level. (Appellant's Br. p. 7).

On July 26, 2001, the jury found Watson guilty of Count I and Count III and not guilty of Count II. On September 5, 2001, the trial court sentenced Watson to the Indiana Department of Correction for a period of fifteen years with ten years executed and five years suspended on formal probation for Count I. Additionally, the trial court dismissed Count III pursuant to double jeopardy and with agreement of both parties. Further, as a condition of Watson's probation, the trial court ordered that Watson complete anger control counseling sessions.

Watson now appeals.

## DISCUSSION AND DECISION
### I. Admissible Evidence

First, Watson argues that the trial court erred in allowing the testimony of Dr. Tarr into evidence. Specifically, Watson presented the expert testimony of Dr. Spencer to support the claim that his statement to the police was the result of coercion. At trial, Dr. Spencer testified that Watson's statement to the police was not voluntary and could not be relied upon. As part of her assessment, Dr. Spencer administered an MMPI on Watson.

In response to Dr. Spencer's testimony, the State presented the results of an MMPI completed by Watson in the course of the CHINS investigation that arose from the actions that caused criminal charges against Watson. However, Watson contends that the State is not allowed to present Dr. Tarr's testimony, because of the physician-patient privilege. Alternatively, the State maintains that no physician-patient privilege attached to Dr.

Tarr's assessment of Watson because the assessment was done pursuant to a court order. Moreover, the State asserts that Watson waived any privilege that might have attached by voluntarily putting his mental condition into issue in the case.

Initially, we note that reviewing courts accord great deference to the trial court's evidentiary rulings. *Blevins v. Clark,* 740 N.E.2d 1235, 1238 (Ind.Ct.App. 2000). We review evidentiary rulings for abuse of discretion. *Id.* An abuse of discretion occurs when the trial court's decision is against the logic and effect of the facts and circumstances set forth before it. *Ind. Univ. Med. Ctr. v. Logan,* 728 N.E.2d 855, 859 (Ind.2000).

Indiana has created a physician-patient privilege by statute, which renders physicians incompetent to testify regarding matters communicated to them by patients in the course of diagnosis or treatment. *Cua v. Morrison,* 626 N.E.2d 581, 583 (Ind.Ct.App.1993). However, when a patient places her mental or physical condition at issue in a lawsuit, she has impliedly waived the physician-patient privilege to that extent. *Collins v. Bair,* 256 Ind. 230, 268 N.E.2d 95, 101 (1971). The privilege is only waived as to "those matters causally and historically related to the condition put in issue *and which have counterclaim or defense made.*" (emphasis in original) *Collins,* 268 N.E.2d at 101. Medical information not related to the claim retains its privileged status and is not discoverable. *Cua,* 626 N.E.2d at 583.

In the instant case, Watson was compelled to seek treatment from Dr. Tarr. Watson, in all probability, believed that those communications would be kept in confidence. Compliance with that court order dictated that Watson disclose potentially incriminating evidence. It is probable that non-compliance would have result-

ed in the court finding Watson in contempt of court. Therefore, admission of Watson's testimony amounted to a circumvention of Watson's Fifth Amendment rights. *See Sims v. State,* 601 N.E.2d 344, 346 (Ind.1992) (where admission of testimony by defendant's counselor from court-ordered sexual treatment program violated defendant's Fifth Amendment right against compelled self-incrimination in prosecution for child molesting). The purpose of the Fifth Amendment is to prevent compelled self-incrimination, not to protect private information. *Sims,* 601 N.E.2d at 346. Therefore, the physician-patient privilege did attach to Dr. Tarr's assessment of Watson.

However, we find that Watson waived this privilege by voluntarily putting in issue his mental condition as an affirmative defense. *Collins,* 268 N.E.2d at 101. The record reflects that Watson presented the evidence of Dr. Spencer and the results of the MMPI that he completed. Dr. Spencer testified that Watson was a very disturbed person, mentally, during his interview with Detective Smith. Thus, Watson voluntarily put his mental state of mind at issue by way of affirmative defense. As a result, the State was allowed to introduce evidence to rebut Watson's assertion that he was mentally disturbed. *Blevins,* 740 N.E.2d at 1238. Accordingly, we find that the trial court did not abuse its discretion in admitting the testimony of Dr. Tarr into evidence.

## II. *Watson's Sentence*

Next, Watson argues that he was improperly sentenced. Specifically, Watson contends that the trial court improperly relied on aggravating circumstances when enhancing his sentence. Further, Watson asserts that the fifteen-year sentence imposed by the trial court is mani-

festly unreasonable.[1]

A sentence, which is authorized by statute, will not be revised unless it is inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B); *Buchanan v. State*, 767 N.E.2d 967, 972—73 (Ind.2002). When considering the appropriateness of the sentence for the crime committed, courts should initially focus upon the presumptive sentence. *Hildebrandt v. State*, 770 N.E.2d 355, 361 (Ind.Ct.App.2002), *trans. denied*. Trial courts may then consider deviation from the presumptive sentence based upon a balancing of the factors, which must be considered pursuant to I.C. § 35–38–1–7.1(a) together with any discretionary aggravating and mitigating factors found to exist. *Hildebrandt*, 770 N.E.2d at 361.

In the present case, Watson received fifteen years for his conviction, with ten years executed and five years suspended on formal probation. The presumptive sentence for a Class B felony is ten years, with not more than ten years added for aggravating circumstances, and not more than four years subtracted for mitigating circumstances. *See* I.C. § 35–50–2–5. In support of its sentence, the trial court noted the following as aggravating factors:

> The nature and the circumstances of this offense and this … this … this period of time when that child received multiple injuries is clearly an aggravating circumstance. Although, um, both of you gentlemen are correct. His criminal history is not extensive. He does have criminal history and some of it would indicate, um, some lack of impulse control, anger control. That's an aggravator. While it is in fact an element of the offense that the child was under fourteen, there is a continuum there from zero to fourteen years and this was a little boy. This is a little boy, a very, very precious little boy who was entrusted to Mr. Watson for literally his life. Um, while mom was working … there's nothing wrong with that. Men can raise children. Men can nurture children. Men can take care of children. I don't have any problem with this, but this little boy was not nurtured. He was horribly abused, whether it be negligent or intentionally it's really not really relevant. He was hurt repeatedly and the position of trust, of course, is inherent in this situation. Failure to take responsibility is risky because a person has a right to deny that they committed any crime. It's up to the state to prove it and if he still says "I didn't do it," that's okay. He has a right to do that so I decline that as a … as a mitiga … I'm sorry, as a[n] aggravating circumstance.

(Tr. pp. 1101–1102). Additionally, the trial court stated the following as mitigating circumstances:

> However, um, as a mitigator he did do some things to get himself in order with respects to his parenting skills. That's … for what it's worth, I'm not sure, but it is in fact a mitigator. Um, Mr. Watson is a relatively young person and arguable that's a mitigator … Okay, little Dillon is gonna suffer because his daddy did these bad things and that's not little Dillon's fault and it will be a hardship to Dillon of course. Alright,

---

1. On July 19, 2002, our Supreme Court amended Appellate Rule 7(B) effective January 1, 2003. The rule is directed to the reviewing court and sets forth the standard for that review. That review is made as of the date the decision or opinion is handed down. Accordingly, although the sentence here was imposed prior to January 1, 2002, our review has taken place as of this date and the "inappropriate" test is therefore applied.

that's a mitigator. It's worth something.

(Tr. pp. 1102–1103).

When reviewing whether a defendant was properly sentenced, we consider whether the sentence is appropriate considering the "nature of the offense" and the "character of the offender." *See* App. R. 7(B). Here, Watson claims that the age of C.T. was improperly used as an aggravating circumstance. In considering the "nature of the offense", the trial court properly considered C.T.'s age in sentencing Watson, although this court has previously held that a trial court is not allowed to use an element of the offense as an aggravator. *See Holmes v. State*, 642 N.E.2d 970, 972 (Ind.1994) (stating, "it is well settled that a trial court may not treat an element of the offense as an aggravating factor.") In the present case, the trial court was statutorily required to consider C.T.'s age. *See* I.C. § 35–38–1–7.1(a)(4). Specifically, I.C. § 35–38–1–7.1(a)(4) states, in pertinent part:

> (a) In determining what sentence to impose for a crime, the court *shall* consider:
>
> (4) whether the victim of the crime was less than twelve years of age or at least sixty-five years of age;

(emphasis added). At the time of the battery, C.T. was three years old, which is a statutorily mandatory consideration. As a result, we find that the trial court properly considered C.T.'s age as an aggravating circumstance in sentencing Watson.

 Watson also argues that the trial court erred in considering C.T.'s burn incident within a series of other incidents as aggravators. Specifically, Watson contends that because he was acquitted of the charge relating to the burn incident, the trial court may not consider this charge as an aggravating circumstance. We agree with Watson's contention that the trial

court may not consider the burn incident; however, the record reveals that C.T. sustained a series of injuries, other than the burn incident, that were properly considered. As stated above, C.T. was admitted to the hospital three times during the months of June and July 1999. In particular, the record reflects that C.T. sustained an acute concussion, a crush injury to his finger, and bruising around his left eye. Thus, the record is clear that the trial court was presented with sufficient evidence that C.T. had multiple injuries other than the burn incident. Consequently, it is our determination that the trial court properly relied upon the series of injuries that C.T. sustained as aggravators in sentencing Watson.

 Lastly, Watson argues that the trial court improperly characterized his prior criminal history as an aggravating circumstance. Here, the trial court properly found that Watson had committed other offenses in the past. However, Watson's history of criminal activity was limited to a juvenile adjudication and misdemeanor probation. Specifically, the record reveals that Watson had a juvenile adjudication for recklessness or disorderly conduct and a probation sentence for possession of marijuana. The record also reveals that Watson's prior offenses were not violent.

 Nevertheless, our decisional law requires that the trial courts identify all "significant" aggravating circumstances. *See e.g., Widener v. State*, 659 N.E.2d 529 (Ind.1995); *Hammons v. State*, 493 N.E.2d 1250 (Ind.1986). Significance varies based on the gravity, nature and number of prior offenses as they relate to the current offense. *Wooley v. State*, 716 N.E.2d 919, 932 (Ind.1999). Therefore, a criminal history comprised of a prior conviction for operating a vehicle while intoxicated may

rise to the level of a significant aggravator at a sentencing hearing for a subsequent alcohol-related offense. *Wooley,* 716 N.E.2d at 932. However, this criminal history does not command the same significance at a sentencing hearing for murder. *Id.*

In the present case, Watson was charged with battery resulting in serious injury to a person less than fourteen years of age. As mentioned above, Watson's prior criminal history consisted of a juvenile adjudication for recklessness or disorderly conduct and a probation sentence for possession of marijuana. Thus, given Watson's limited prior contacts with the justice system and the non-violent nature of his prior offenses, we conclude that, in this case, a criminal history comprised of two, nonviolent misdemeanors that are unrelated to the present offense are not significant aggravators in the context of a sentencing hearing for battery. *See Wooley,* 716 N.E.2d 919 at 929.

■ However, "[d]espite a trial court's use of an improper aggravating circumstance to enhance a sentence, this court will affirm if the other aggravating circumstances are adequate to support the sentence imposed." *Robinson v. State,* 693 N.E.2d 548, 554 (Ind.1998) (citing *Scheckel v. State,* 620 N.E.2d 681, 684 (Ind. 1993)). In the instant case, although the trial court improperly relied upon Watson's prior criminal history in enhancing Watson's sentence, the other aggravating factors considered by the trial court represent particularized, individual circumstances of the criminal act. *Morgan v. State,* 675 N.E.2d 1067, 1073 (Ind.1996). Therefore, the other aggravators support imposition of an enhanced sentence. *See Hatchett v. State,* 740 N.E.2d 920, 929 (Ind.Ct.App.2000) (a sentence enhancement may still be upheld when a trial court improperly applies an aggravator but other aggravators still exist).

■ Moreover, in considering the "character of the offender" pursuant to T.R. 7(B), the trial court properly cited as an aggravator that Watson was in a position of trust with C.T. In *Bacher v. State,* 722 N.E.2d 799, 802 (Ind.2000), our supreme court held that being in a "position of trust" with the victim is a valid aggravating circumstance. Additionally, our supreme court has affirmed a finding that a live-in boyfriend is in a position of trust with regard to the children of his live-in girlfriend. *See Martin v. State,* 535 N.E.2d 493, 498 (Ind.1989). Such is the case here. In this case, C.T. was entrusted to Watson as a caregiver during the hours Tucker was at work. C.T., being three years old, trusted Watson and relied upon him for his basic care and needs. Although Watson was not C.T.'s biological parent, he was Tucker's live-in fiancé. Therefore, we find that Watson was in a position of trust with C.T. However, as the trial court previously stated, Watson disregarded C.T.'s trust, either intentionally or negligently, which resulted in major injuries to C.T. Accordingly, in view of valid aggravating circumstances, we find no error in the trial court's imposition of an enhanced sentence.

### CONCLUSION

Based on the foregoing, we conclude that Watson was properly convicted and the trial court stated sufficient aggravators to support the imposition of an enhanced sentence. Furthermore, we conclude that the sentence was not inappropriate, given the nature of the offense and the character of the offender. *See* App. R. 7(B); *See Buchanan,* 767 N.E.2d at 972–73.

Affirmed.

BAKER, J., and DARDEN, J., concur.